UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____
LESLIE A. BEACH,
                        Plaintiff,            05-CV-6175T

v.                                            DECISION
                                              and ORDER
JOANNE B.BARNHART,
Commissioner of Social Security,

                        Defendant.
_____

## INTRODUCTION

Plaintiff, Leslie A. Beach ("Beach") filed this action
pursuant to the Social Security Act, codified at 42 U.S.C.
§§ 405(g) and 1383(c)(3), seeking review of a final decision of the
Commissioner of Social Security ("Commissioner") denying his claim
for Disability Insurance Benefits ("Disability") and Supplemental
Security Insurance ("SSI").   On December 14, 2005 Commissioner
moved for judgment on the pleadings pursuant to Rule 12(c) of the
Federal Rules of Civil Procedure.   On January 13, 2006, the
plaintiff cross-moved for judgment on the pleadings.

For the reasons that follow, this Court finds that the
Commissioner's decision is supported by substantial evidence.
Accordingly, plaintiff's motion for judgment on the pleadings is
denied and defendant's motion for judgment on the pleadings is
granted.

## BACKGROUND

Plaintiff applied for disability benefits on November 1, 2002
claiming that he was unable to work due to post-concussion

syndrome, herniated nucleus pulposus at C5-6 with cervical fusion, a depressive disorder, an anxiety disorder, hypertension and headaches (Tr. 59-73). Plaintiff's application for a closed period of benefits between January 30, 2002 and June 2, 2003 was denied by Notice dated January 23, 2003 (Tr. 36-40).

Plaintiff filed a request for a hearing before an ALJ on February 26, 2003 (Tr. 41). A hearing was held on June 15, 2004 via video teleconference. The plaintiff testified and was represented by counsel (Tr. 605-658). A vocational expert also appeared and testified at the hearing. In his decision dated November 22, 2004, the ALJ concluded that plaintiff was not disabled (Tr. 14-27). Plaintiff requested a review which was denied on March 9, 2005 (Tr. 6-8). Plaintiff commenced this action on April 14, 2005.

A.    <u>Medical Background</u>

Plaintiff claimed that he first experienced pain after a motor vehicle accident on January 30, 2002. He began to have neck pain and stabbing back pain after a semi-truck hit his vehicle and flipped it over (Tr. 87, 131). In a letter dated March 5, 2002, Dr. Cargill Alleyne of Strong Memorial Hospital explained that Beach primarily complained of confusion, headaches, neck pain and lower back pain (Tr. 131). Beach was diagnosed with post-concussive syndrome and cervical damage. Beach described the pain as spreading from his lower back through his right leg and foot.

His neck pain went through his head (Tr. 87).  Beach had numbness and tingling from his neck to his bilateral hands and fingers.  An EEG performed on February 28, 2002 showed normal results for the patient's age (Tr. 298).  An MRI of the cervical spine on March 14, 2002 showed evidence of degenerative disc disease at the C5-6 and C6-7 levels (Tr. 163). At the C5-6 level, there was evidence of a "mild degree of narrowing on the right" and "foraminal narrowing on the left" (Tr. 163).

Dr. Allen Pettee, a neurologist, evaluated Beach on March 13, 2002 (Tr. 328).  He noted that Beach complained of tingling in the fingers, severe neck and shoulder pain and difficulty with concentration (Tr. 328).  Dr. Pettee noted a normal head CT and lumbosacral spine x-ray, but the cervical spine x-ray showed disc space narrowing with degenerative change at C5-6 and right sided nerve root foramen encroachment at that level (Tr. 328). Dr. Pettee opined that plaintiff's headache, memory loss, dizziness and ataxia were consistent with symptoms of concussion from the motor vehicle accident (Tr. 329).  The finger tingling was suggestive of cervical spine injury.  Dr. Pettee requested a spine MRI and prescribed Amitriptyline (Tr. 329).

Dr. Pettee examined plaintiff on March 27, 2002 for evaluation of his arm and leg pains (Tr. 325).  Beach had tingling down his arms and into his hands with neck flexion (Tr. 325).  Dr. Pettee opined that the finger tingling was "most likely a

myeloradiculopathy with a very mild carpal tunnel syndrome with
normal conductions on the left" (Tr. 326).   Dr. Pettee cleared
Beach for gentle chiropractic manipulations and Amitriptyline
(Tr. 327). He noted that the complications from the motor vehicle
accident would "require time" (Tr. 327).

Plaintiff was examined by Dr. Fred San Filipo, a chiropractor,
on March 29, 2002.   Dr. San Filipo found that plaintiff had full
range of motion but that it was painful at the extreme of flexion
(Tr. 240).   Dr. San Filipo concluded that plaintiff had a lumbar
sprain complicated with "spondylitic spondylolistheses" rendering
plaintiff temporarily totally disabled (Tr. 240).

An MRI of the lumbar spine on April 6, 2002 found that there
were degenerative changes at the L2-L3 and L4-L5 levels (Tr. 160).
Furthermore, there was "minimal superimposed central disc
herniation/protrusion" (Tr. 160).   There was no significant neural
foraminal narrowing at L2-L3 nor evidence of significant posterior
disc herniation, spinal canal stenosis or neural foraminal
narrowing at the other lumbar levels (Tr. 160).   There was
degenerative disc disease at the C5-C6 and C6-C7 levels with
evidence of a mild degree of spinal stenosis and a severe degree of
foraminal narrowing on the right and a mild degree of foraminal
narrowing on the left (Tr. 220).

Dr. Pettee's evaluation of plaintiff on May 29, 2002 found
that there was a "small central disc herniation" which was of

4

"questionable significance" (Tr. 323).    Dr. Pettee noted that there was "mild nerve root foramen encroachment" which possibly explained the "radicular symptoms down the right leg with tingling into the right foot" (Tr. 323).  Beach reported that chiropractic treatment and Amitriptyline improved his lower back pain (Tr. 323). Dr. Pettee's examination showed negative straight leg raising with no lumbar tenderness.  He noted that Beach was gradually improving (Tr. 323).

Plaintiff went to Strong Health Clinic on May 29, 2002 for a reevaluation of his right knee for closure of his right knee Workers' Compensation case (Tr. 292).  At that time, plaintiff noted that he was continuing to have stiffness in the right knee after sitting and intermittent retropatellar pain in both knees (Tr. 292).  On examination, the right knee range of motion was 0 to 130 degrees with no effusion.  There was no tenderness to medial or lateral patellar facet palpation and no inferior pole patellar tenderness.    He was diagnosed with "mild ongoing symptoms compatible with the known articular damage to his right knee" (Tr. 292).  Beach was advised to resume systematic exercises for his legs.

Medical notes by Dr. San Filipo dated June 4, 2002 reveal that plaintiff's lower back condition had improved but that he was still symptomatic regarding his cervical spine and closed head injuries (Tr. 238).  Dr. San Filipo recommended a neuropsychological

5

evaluation for ongoing headaches and lack of concentration (Tr. 238). Otherwise, plaintiff was to continue manual therapy for the cervical spine with a graded goal towards home therapies including cervical stabilization exercises and stretches (Tr. 238).

Dr. John Schmidt, a neurologist, examined plaintiff on July 17, 2002 for complaints of difficulty with concentration, short-term memory, mood, ringing in the ears, tingling in the hands, difficulty with sleeping, anxiousness and neck pain and stiffness (Tr. 308). Dr. Schmidt administered trigger point injections in the neck which gave Beach almost full relief (Tr. 309). Dr. Schmidt prescribed Remeron and recommended occupational therapy and a cognitive and behavioral evaluation (Tr. 309). Plaintiff returned to Dr. Schmidt on July 29, 2002 with post concussive syndrome, organic mood disorder and myofascial pain (Tr. 307). Beach remarked that he had relief from his neck pain as a result of the trigger point injections and relief from his mood disorder as a result of the Remeron (Tr. 307).

Plaintiff returned to see Dr. Schmidt on August 28, 2002 and September 9, 2002 for myofascial pain in the neck (Tr. 305-6). Beach complained of numbness and tingling in the hands. Dr. Schmidt noted that Beach had good strength in his arms but that his reflexes were absent on the brachioradialis as well as the biceps signaling a problem with C5-6 bilaterally roots. Dr. Schmidt re-administered trigger point injections (in the neck)

6

and plaintiff had some relief.    Dr. Schmidt recommended that he
return in one or two weeks for further treatment (Tr. 305).

A brief neuro-cognitive evaluation of Beach was conducted on
August 6, 2002 (Tr. 374).    On a self-administered symptom
checklist, he noted an extremely high level of overall
psychological distress with peak scores on scales corresponding to
somatization, obsessive-compulsive and anxiety (Tr. 374).  Beach's
cognitive profile showed abilities in the above average to superior
range across domains.    Measures of rote, complex and sustained
attention were all average to above average.    Verbal and visual
memory measures were average to above average (Tr. 374).  Overall,
plaintiff's cognitive profile was "well within normal limits" with
above average to superior performance (Tr. 374).    His subjective
complaints were "greatly in excess of results obtained on testing"
(Tr. 374).    The evaluation suggested a "psychogenic component to
his perceived cognitive difficulties" (Tr. 374).    He was referred
for further counseling for relaxation training (Tr. 375).

Beach was provided counseling at the Unity Health System
Rehabilitation Center on August 20 and 27, 2002 (Tr. 302-303).
Beach reported continuing neck pain and headaches and was
interested in trigger point injections to alleviate his pain
(Tr. 302).    Counseling focused on goals and rationale for short-
term training in progressive muscle relaxation which he was to
practice daily (Tr. 302).    Plaintiff had a subsequent counseling

session on September 3, 2002 for continuing neck pain and headache. Beach was referred to Dr. Kuttner at Highland Hospital for pain management (Tr. 300).

Neurosurgeon Dr. William Cotanch examined plaintiff on September 18, 2002 for a second opinion (Tr. 251). He found plaintiff to be alert and oriented with a good range of motion of his neck (Tr. 251). Upper extremities had normal strength but there was some tingling in the fourth and fifth fingers of both hands. Lower extremities had normal strength, sensation and reflexes with full straight leg raises and a normal gait (Tr. 252). A cervical MRI scan showed degenerative disease with protrusion of the L5-L6 disc (Tr. 252). Dr. Cotanch opined that there were no specific deficits and that, although not medically necessary, surgery was an option (Tr. 252).

An MRI performed on September 27, 2002 revealed that Beach had a herniated nucleus pulposus at the C5-C6 level with bilateral foraminal narrowing (Tr. 127, 129, 136). There was "minor disc bulging" at C2-3, C3-4, C4-5 and C6-7 but "moderate disc narrowing, desiccation and a moderately large disc/spur complex" at C5-6 (Tr. 136). "Moderate flattening of the ventral aspect of the spinal cord" was found at C5-C6 (Tr. 137).

On October 11, 2002 Beach had surgery for an anterior cervical discectomy and fusion with a plate at the C5-C6 level at Strong Memorial Hospital performed by Dr. Cargill Alleyne (Tr. 126-128).

During postoperative visits to Dr. Alleyne, Beach reported that his preoperative arm pain was resolved by the surgery (Tr. 149).

In October, 2002 Beach was experiencing abdominal tenderness as well as fever, chills and a 10 pound weight loss (Tr. 152). On November 14, 2002 Beach underwent surgery to repair an incarcerated epigastric hernia (Tr. 146).

On November 4, 2002 plaintiff was examined as a follow up to the cervical discectomy and fusion (Tr. 596). No complications were present and there were no significant interval changes (Tr. 596).

Medical records from an examination on December 4, 2002 indicate that plaintiff's neck and upper extremity pain had lessened but he was still having ongoing low back and right leg pain (Tr. 233). Beach was treated with traction and mobilization/manipulative procedures (Tr. 233). Beach also continued to have numbness in both hands and constant pain in the neck that radiated upwards and gave him headaches (Tr. 164). Beach experienced pain that would radiate down his right leg to his foot (Tr. 164). On December 5, 2002 Beach was treated at the Strong Health Clinic for follow up to his hernia surgery (Tr. 280). Examination found him to be looking "great", "muscular" with minimal tenderness in the left inguinal canal. (Tr. 280) Plaintiff, however, complained of chronic inguinal pain in the left side yet a CT scan and physical exam did not reveal any anatomic problem.

(Tr. 280) Plaintiff was referred to the pain clinic for an anesthesia pain consultation. (Tr. 280)

Dr. Ramon Medalle examined plaintiff on December 6, 2002 and found that plaintiff had full flexion, full extension and full lateral flexion but that he had discomfort in performing any of these movements. (Tr. 166) There was full range of motion to the spine and extremities. (Tr. 166-167) Dr. Medalle noted that Beach was "markedly limited" in performing repetitive movements especially if he had to elevate his arms above his shoulder. (Tr. 167) Beach was "mildly limited in activities requiring prolonged sitting, standing, bending and lifting." (Tr. 167)

Dr. Suozzi completed a form for the New York State Department of Temporary and Disability Assistance on December 7, 2002 in which he stated that plaintiff had post-concussive syndrome with difficulty concentrating and with his memory. (Tr. 332) Beach reported continued headaches and disc disease. Dr. Suozzi opined that Beach was unable to work because his problems with "headache, difficulty concentrating, difficulty remembering and depression." (Tr. 333)

On December 7, 2002, Dr. Anthony Suozzi prepared a statement that Beach was unable to work primarily because of his concentrating ability and continuing headaches. (Tr. 177) Dr. Suozzi also noted that Beach suffered from depression and difficulty remembering. (Tr. 177)

10

Dr. Louis Medved, a neurologist, examined plaintiff on December 16, 2002. (Tr. 169-172) He noted the struggle that Beach had with constant headaches and he discussed the continued use of daily prophylactic agents to reduce their frequency (Tr. 171). Dr. Medved also noted the lumbar strain with possible radiculopathy involving the right lower leg. However, he wondered that the MRI did not reveal lesions which would be encroaching on any spinal nerve roots. (Tr. 171)

On December 23, 2002, plaintiff was treated by Dr. Alleyne at Strong Health Clinic for follow up from back surgery. (Tr. 290, 594) Beach reported that the arm pain was resolved but that he had some mild numbness of the fingertips that was "non-disabling." (Tr. 290)

Dr. Medved examined Beach on January 2, 2003 for EMG/NCV studies of the right lower extremity to exclude right lower extremity radiculopathy associated with his back and radicular right leg complaints. (Tr. 317) The electrodiagnostic impression showed a "normal study for the nerves and muscles" tested. (Tr. 318) There was no evidence for peripheral nerve entrapment into the right lower extremity. Because surgery was not indicated, Dr. Medved discussed with Beach the options of lumbar epidural blocks but plaintiff was not interested in these options. (Tr. 318)

A psychiatric evaluation was performed on January 7, 2003. (Tr. 178-186) Beach indicated that he had just begun psychiatric

counseling and that he was taking Neurontin. (Tr. 178) Dr. John Thomassen, the psychiatric evaluator, found that Beach had some "mild symptoms of depression secondary to his physical ailments." (Tr. 181) His prognosis was fair and Dr. Thomassen found that Beach was able to manage his own funds. (Tr. 181)

A Physical Residual Functional Capacity Assessment was completed on January 10, 2003. (Tr. 187) Beach was found to be able to lift or carry 20 pounds, stand or walk or sit about six hours in an eight hour day and be able to push or pull an unlimited amount. (Tr. 188) Beach could occasionally climb and stoop but could frequently balance, crouch, crawl and kneel. (Tr. 189) However, plaintiff was found to be markedly limited in his ability to perform repetitive upper arm movements above shoulder level. (Tr. 191) A Mental Residual Functional Capacity Assessment completed on January 23, 2003 found that Beach was "moderately limited" in his ability to understand and remember detailed instructions, his ability to carry out detailed instructions and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 207) However, he was "not significantly limited" in his ability to remember locations and work-like procedures, ability to understand and remember short and simple instructions, ability to carry out short and simple instructions, ability to maintain attention and concentration for extended periods, ability to perform activities

12

within a schedule, maintain regular attendance and be punctual, ability to work in coordination with or proximity to others and the ability to make simple work related decisions. (Tr. 207) The report concluded that Beach's allegations of significant memory and concentration impairment were "not credible." (Tr. 209) The consultant found that plaintiff was "able to understand, remember and carry out simple instructions." (Tr. 209)

An x-ray of the cervical spine taken on January 23, 2003 showed that there was no evidence of fracture or dislocation. (Tr. 214) There was "mild neuroforaminal narrowing at C5-6 on the right. (Tr. 214)

Dr. Medved treated plaintiff on January 30, 2003 for continued headaches. (Tr. 316) Dr. Medved noted that plaintiff was already taking Effexor and prescribed Neurontin which he was directed to increase the dosage incrementally. (Tr. 316)

Dr. Suozzi examined Beach on February 3, 2003 as a follow up to the post-concussive syndrome. (Tr. 372) Plaintiff was taking Effexor, Neurontin and Vasotec. Plaintiff was continuing to visit the chiropractor. (Tr. 372)

Dr. Suozzi saw Beach on March 3, 2003 regarding his ongoing pain, tiredness and difficulty concentrating. (Tr. 370) Plaintiff had stopped taking Effexor and Vasotec on his own. Beach reported that he was done with the neurologist as well as the chiropractor. Beach felt that his neck was back to its condition prior to the

13

accident but that he continued to feel tired and lacked the ability to concentrate. (Tr. 370) Dr. Suozzi had Beach taper off the Neurontin, stay off the Vasotec and stay off medications to see if his ability to concentrate improves. (Tr. 370)

Plaintiff was treated by Dr. Alleyne at the Strong Health Clinic on March 10, 2003 for arm pain and some bilateral upper neck pain. (Tr. 289, 591) Plaintiff was started on physical therapy and to continue on Flexeril. (Tr. 289)  An EEG performed on April 11, 2003 showed normal results for patient's age. (Tr. 296, 592)

Dr. Steve Park, plaintiff's ophthalmologist, explained Beach's visual limitations in a letter dated June 2, 2003. (Tr. 225) Beach had "extensive scotoma OD" as a result of a traumatic injury in 1972 when he was hit in the eye with a soccer ball.  Beach's visual field test OS was "completely normal." (Tr. 225)  There had been no acute change in plaintiff's visual status.

By the time plaintiff completed a disability form on December 4, 2003, he reported that the severe headaches were gone and his vision was improving.  However, the hearing difficulties were not improving and the lower back was still painful and the right leg had pain and numbness. (Tr. 88) Beach claimed that he still had headaches every day, low back pains three to five times each week and neck pain every day. (Tr. 88)  To relieve the pain, Beach took Tylenol with codeine. (Tr. 88) Beach was also taking Effexor for depression and anxiety as well as Enalpril. (Tr. 102)

By written note dated May 13, 2004, Dr. Suozzi stated that
Beach was under his care from January, 2002 through May, 2003
during which time he was totally disabled "both mentally from the
post-concussive syndrome as well as physically from the neck
surgery." (Tr. 331)

B.   <u>Non-Medical Background</u>

Beach is a 48 year old male with a high school diploma and
three years of college courses.  (Tr. 122, 174)

Beach worked as a highway foreman for the highway department
from October, 1992 through January 30, 2002. (Tr. 66) Prior to that
position he was a pipe layer operator from April, 1991 through
October, 1993 and was a form carpenter from September, 1987 through
December, 1990. (Tr. 66) As a highway foreman, he supervised a
group of workers numbering one to thirty and operated heavy
equipment, drove dump and plow trucks and lay pipes to build a
catch basin. (Tr. 66, 614)

Medical notes from Dr. Ramon Medalle dated December 6, 2002
indicate that Beach could cook meals, do laundry and shop for food
and clothes. (Tr. 165) At that time, Beach could also shower, bathe
and dress himself.

At the time Beach completed the disability form for the
New York State Office of Temporary and Disability Assistance on
December 4, 2002, Beach was living with his fiancee and her two
children. (Tr. 79) He claimed that he spent his days around the

house watching television, taking a nap and, if he felt well enough, he would do some laundry. (Tr. 80) Prior to his illness, Beach claimed that he would go camping, fishing, hiking, running, biking, soccer, and do yard work. He was not limited in his ability to do any physical activities. (Tr. 80) However, at the time he completed the disability form, he claimed he was unable to do any of these activities. (Tr. 83) Beach was not able to sleep through the night but did not need special help to take care of his personal needs. (Tr. 80-81) He was only able to drive to doctors' appointments. (Tr. 82) He did claim he would be able to walk a mile. (Tr. 85)

Plaintiff testified at the hearing that he was able to lift two gallons of milk or the equivalent of 14 to 15 pounds. (Tr. 630) He would also move lumbar around his own yard. (Tr. 630) He was also able to mow the lawn with a rider mower and weed the garden for 20 minutes at a time. (Tr. 631, 639)

A vocational expert, Robert Jackson, testified at the hearing. (Tr. 649-658)   Mr. Jackson classified plaintiff's past relevant work as a highway foreman as medium level, skilled, work. (Tr. 652) His prior work as a pipe layer was classified as "semi-skilled" heavy work. (Tr. 652) There are jobs that would be transferable to the light exertional level such as grader and scraper operator positions. (Tr. 653) Given a hypothetical individual the same age, education and past work experience as plaintiff who is capable of

a range of light work, who can occasionally lift or carry up to
20 pounds, frequently lift and or carry up to ten pounds and stand
or walk with normal breaks for about six hours each day, and would
occasionally climb ramps and stairs, balance, stoop, kneel, crouch,
and crawl and would be no more than occasional reaching above the
shoulder, and is moderately limited in his ability to understand
and remember and carry out detailed instructions, he could not
return to any of the past relevant jobs. (Tr. 654) However,
Mr. Jackson opined that with the moderate limitation on the ability
to complete a normal workday, a job such as a production inspector
grader at the light unskilled level would be possible as well as a
parking lot attendant. (Tr. 654-55) With the additional limitation
that a person would need to lay down periodically during the day
for pain relief, Mr. Jackson testified that there would not be a
significant number of jobs at any exertional level. (Tr. 655) In
the area of unskilled work, Mr. Jackson testified that an employer
would allow an employee to miss one day per month over a twelve
month period. (Tr. 656)


<u>DISCUSSION</u>

    Pursuant to 42 U.S.C. § 405(g), the factual findings of the
Commissioner are conclusive when they are supported by substantial
evidence. <u>Rivera v. Harris</u>, 623 F.2d 212, 216 (2d Cir. 1980).  A
disability is defined as:

17

> the inability to engage in any substantial gainful
> activity by reason of any medically determinable physical
> or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for
> a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).   An individual's
physical or mental impairment is not

disabling under the Act unless it is:

> of such severity that he is not only unable to do his
> previous work but cannot, considering his age, education
> and work experience, engage in any other kind of
> substantial gainful work which exists in the national
> economy.

42 U.S.C. §§ 423(d)(2)(A), 1383(a)(3)(B).  <u>Berry v. Schweiker</u>, 675
F.2d 464, 467 (2d Cir. 1982).

In evaluating disability claims, the Commissioner is required
to sue the five step process promulgated in 20 C.F.R. §§ 404.1520
and 416.920.  First, the Commissioner must determine whether the
claimant is engaged in any substantial gainful activity.  Second,
if the claimant is not so engaged, the Commissioner must determine
whether the claimant has a "severe impairment" which significantly
limits his ability to work.  Third, if the claimant does suffer
such an impairment, the Commissioner must determine whether it
corresponds with one of the conditions presumed to be a disability
by the Social Security Commission.  If it does, then no further
inquiry is made as to age, education or experience and the claimant
is presumed to be disabled.  If the impairment is not the
equivalent of a condition on the list, the fourth inquiry is
whether the claimant is nevertheless able to perform his past work.

If he is not, the fifth and final inquiry is whether the claimant can perform any other work.  Bush v. Shalala, 94 F.3d 40, 44-45 (2d Cir. 1996).

Here, the ALJ followed the five step procedure.  In his decision dated November 22, 2004, the ALJ found that plaintiff (1) had not engaged in substantial gainful activity since the date of disability January 30, 2002; (2) that plaintiff suffered from post-concussion syndrome, herniated nucleus pulposus at C5-6 with cervical fusion, a depressive disorder and an anxiety disorder that were severe; (3) did not have an impairment listed in Appendix 1, subpart P, Regulation No. 4; (4) did have the residual functional capacity to perform a significant amount of work at the light level of exertion ; and (5) did not have the residual functional capacity to perform his past relevant work.  (Tr. 19-26)

Plaintiff contends that the Commissioner erred in (1) failing to follow the treating physician rule;(2) failing to properly evaluate plaintiff's subjective complaints of fatigue, pain, weakness, confusion, and sleeplessness in making his decision; (3) failing to evaluate the importance of post-concussive syndrome; (4) failing to properly evaluate plaintiff's Residual Functional Capacity; and (5) failing to provide accurate information to the vocational expert.

Plaintiff argues that the ALJ failed to properly weigh the medical opinion of his primary physician, Dr. Suozzi.  The opinions

of treating sources are only entitled to controlling weight if they are well supported and not contradicted. 20 C.F.R. §§ 404.1527 and 416.927.  Plaintiff points out that Dr. Suozzi rendered an opinion that plaintiff suffered from post-concussive syndrome and had difficulty concentrating.  Beach also points out that Social Security's Mental Residual Functional Capacity Assessment further supports his opinion that he was unable to work because it found him to be "moderately limited" in three areas of functioning on account of a depressive disorder.

The ALJ considered plaintiff's treating sources, and pointed out that the medical evidence did not fully substantiate plaintiff's allegations as to the incidence, duration and severity of his complaints.  The record indicated that plaintiff was involved in a motor vehicle accident causing some medical problems which were resolved within a twelve month period. (Tr. 23) The ALJ noted that nine months after the accident, plaintiff experienced significant improvement of his symptoms following a cervical discectomy and fusion. (Tr. 23) One month later, the medical evidence showed that plaintiff had full range of motion of his upper extremities.  Plaintiff's orthopedic examination showed normal gait and station.  He did not need help changing for the examination nor getting on and off the examining table.  Beach had full range of motion of the shoulders, elbows, forearms and wrist and took only Advil for pain.

To the extent plaintiff relies on anxiety and depression as a basis for disability, plaintiff's own doctor found above average to superior performances across most domains.  Indeed, Dr. Thomassen found only "moderate functional limitations" when plaintiff had to carry out detailed instructions, completing a normal workday and workweek, setting realistic goals or making plans independent of others.  (Tr. 181An objective, comprehensive neuropsychological evaluation of plaintiff at Unity Health System on August 6, 2002 showed that Beach's cognitive abilities were in the above average to the superior range across domains.  (Tr. 373-374)  Measures of rote, complex and sustained attention were all average to above average.  Verbal and visual memory measures were average to above average. (Tr. 374) Overall, the report concluded that plaintiff's cognitive profile was "well within normal limits" with above average to superior performance. (Tr. 374)

The ALJ specifically considered Dr. Suozzi's opinion that plaintiff was totally disabled due to his depressive disorder and headaches.  Dr. Suozzi stated that plaintiff had post-concussive syndrome with difficulty concentrating and with his memory. (Tr. 332) Beach reported continued headaches and disc disease. Dr. Suozzi opined that Beach was unable to work because his problems with "headache, difficulty concentrating, difficulty remembering and depression." (Tr. 333)

21

On December 7, 2002, Dr. Anthony Suozzi prepared a statement that Beach was unable to work primarily because of his concentrating ability and continuing headaches. (Tr. 177) The ALJ properly noted, however, that plaintiff had been prescribed medications for his depressive disorder and had been examined by psychologists and a neurologist who all reported that his mental impairments caused, at best, moderate functional limitations.  In contrast to the neuropsychological reports, Dr. Suozzi's opinion of plaintiff's disability was based on the subjective complaints of plaintiff.

The ALJ evaluated plaintiff's impairments and considered Listings 1.02, 1.04, 11.01, 12.04 and 12.06, and determined that plaintiff's impairments did not meet or equal either listing. (Tr. 19) Plaintiff does not argue that the ALJ erroneously evaluated the evidence based on the Listings, rather, he contends that the ALJ misapplied Medical Vocational Rule 202.22 as a "framework for decision-making."  He proffers that the grid should be used only where the characteristics of the claimant identically match the criteria of a particular rule and would be inapplicable where a claimant has a non-exertional impairment.  Thus, he argues, the ALJ should have provided particularized proof of the plaintiff's ability to perform specific jobs.  Whether one uses the grid as a guideline or examine the medical evidence on its face,

substantial evidence supports the ALJ finding that plaintiff was not totally disabled for twelve months.

Next, plaintiff argues that the ALJ erroneously found Beach to be partially credible.  Further, plaintiff argues that the ALJ's observations of plaintiff were two years after the closed period in question and therefore not relevant to how plaintiff felt at the time at issue.  The ALJ determined that plaintiff's claim was out of proportion to the evidence and clinical findings in the record and did not support a conclusion that his limitations were of such intensity, frequency or duration as to preclude the performance of all work.

There must be medical signs and laboratory findings which reveal a medical condition that could reasonably be expected to produce the conditions alleged and which, when considered with all the evidence, indicates that plaintiff is disabled. 20 C.F.R. § 404.1529.  Plaintiff's subjective statements about his pain or other symptoms, without more, cannot be the basis for finding a disability. 42 U.S.C. § 423(d)(5)(A).

The ALJ noted that plaintiff reported that he was doing "extremely well" just nine months after the accident and that he told various medical personnel that he was able to perform a variety of activities of daily living including household chores, operating a motor vehicle and taking care of his personal needs.

The January 2, 2003 EMG/NCV studies of the right lower extremity showed a "normal study for the nerves and muscles." (Tr. 318) There was no evidence for peripheral nerve entrapment into the right lower extremity.  Although plaintiff was offered a lumbar epidural block, he was not interested in this option. (Tr. 318)

A Mental Residual Functional Capacity Assessment completed on January 23, 2003 found that Beach was "moderately limited" in his ability to understand and remember detailed instructions, his ability to carry out detailed instructions and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. (Tr. 207) However, he was "not significantly limited" in his ability to remember locations and work-like procedures, ability to understand and remember short and simple instructions, ability to carry out short and simple instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance and be punctual, ability to work in coordination with or proximity to others and the ability to make simple work related decisions. (Tr. 207) The report concluded that Beach's allegations of significant memory and concentration impairment were "not credible." (Tr. 209) The consultant found that plaintiff was "able to understand, remember and carry out simple instructions." (Tr. 209) Similarly, the Unity Health System Comprehensive Rehabilitation Center neuropsychological report of

August 6, 2002 also found that Beach's subjective complaints were "greatly in excess of results obtained on testing." (Tr. 374)

The ALJ acknowledged that plaintiff could not perform his past relevant work. He considered Dr. Thomassen's report that limited plaintiff's ability to carry out detailed instructions, complete a normal workday and work week and set realistic goals based on plaintiff's depressive and anxiety disorder. He posed a hypothetical to the vocational expert which included moderate limitations in the ability to understand and remember and carry out detailed instructions. (Tr. 653) Further, the hypothetical included a limitation in the ability to complete a normal workday and workweek. (Tr. 654) Even with these moderate limitations, the vocational expert found that such an individual could perform work such as a productions inspector grader, assembler, and parking lot attendant. (Tr. 654-55) Based on this assessment, the ALJ properly concluded that plaintiff could perform other work and was therefore not disabled.


<u>CONCLUSION</u>

I find substantial evidence in the record to support the ALJ's conclusion that plaintiff is not disabled within the meaning of the Social Security Act. Accordingly, the decision of the Commissioner denying plaintiff's disability claim is affirmed, the plaintiff's motion for summary judgment is denied, the defendant's motion for

judgment on the pleadings is granted and the complaint is dismissed.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca

_____
     MICHAEL A. TELESCA
United States District Judge

DATED:     Rochester, New York
           June 29, 2006